I, Gregg Deboer, a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") and assigned to a DEA High Intensity Drug Trafficking Area ("HIDTA") Task Force in Worcester, Massachusetts, being duly sworn, depose and state that:

1.      I am a detective with the Hopkinton Police Department, where I have been employed since 1999. Prior to that, I was employed by the Westborough and Charlton Police Departments for a total of five years. I am currently assigned as Task Force Officer ("TFO") with the Drug Enforcement Administration's ("DEA") Worcester High Intensity Drug Trafficking Area ("HIDTA") Group.

2.      As a DEA TFO I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3.      I hold a bachelor's degree in Criminal Justice from Western New England College.  I completed basic law enforcement training at the first Municipal Police Officer Class recruit training, Boylston Academy.  While at the academy, I received over 200 hours of training in criminal laws and investigations.  Since graduating from the police academy, I have received hundreds of additional hours of advanced training from the Massachusetts Criminal Justice Training Council, the Massachusetts State Police ("MSP"), the Middlesex District Attorney's Office, the Federal Bureau of Investigation ("FBI"), and the DEA in law enforcement and criminal investigation.  This has included over 100 hours of street level narcotics investigators training.   On numerous occasions, I have acted in the capacity of an undercover police officer where I have been directly involved in the sale and purchase of narcotics.

1

4.      During my career as a law enforcement officer, I have assisted the Hopkinton Police Department, other municipal departments, and the DEA in state and federal drug investigations which have led to the execution of search warrants, the arrest and conviction of individuals involved in drug trafficking, the seizure of money, and the recovery of controlled substances including marijuana, heroin, crack cocaine, powder cocaine, and prescription narcotics.

5.      In the course of my official duties as a law enforcement officer and TFO, I have interrogated defendants, informants, and suspects who were distributors and/or users of controlled substances.   From my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors.   I am also familiar with the full panoply of methods, practices and techniques by which members of organized conspiracies illicitly package, conceal, transport and distribute controlled substances.

6.      I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics-trafficking activity, and to protect their operations, members, narcotics, and narcotics proceeds.

7.      I am also familiar with the appearance and costs of controlled substances, including the controlled substances, heroin and cocaine, which are the principal subjects of this Affidavit.

8.      Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones

2

simultaneously, and use prepaid cellular telephones (where the purchaser/subscriber of the phone

is not required to provide personal identifying information) in an effort to thwart law

enforcement's use of electronic surveillance.   I am also aware that drug traffickers often speak in

vague, guarded, or coded language when discussing their illegal business in an effort to prevent

detection, and often use text messages in lieu of phone calls to avoid speaking over the

telephone.

9.      In the current investigation I have seen and reviewed translations of dozens of

communications involving DEIBBY GARCIA ("DEIBBY") and other members of the GARCIA

Drug Trafficking Organization ("DTO") and have become familiar with their method of

communication.

## PURPOSE OF AFFIDAVIT

10.      This affidavit is submitted for warrants pursuant to Federal Rule of Criminal

Procedure 41 authorizing the search of the following locations:

   a.   6 Windsor Street, Apartment 1, Worcester, Massachusetts ("6 Windsor Street");

   for evidence relating to: the possession and distribution of controlled substances

   (more specifically, cocaine), in violation of Title 21, United States Code, Section

   841(a)(1); the use of a communication facility in furtherance of narcotics-

   trafficking offenses, in violation of Title 21, United States Code, Section 843(b);

   and conspiracy to commit narcotics-trafficking offenses, in violation of Title 21,

   United States Code, Section 846 (hereinafter referred to as the "Target

   Offenses"); and

   b.   The United States Postal Service package addressed to "Vanessa Mendez, 7

3

Cetrina Dr, Marlborough, MA 01752," in the Custody of DEA.

11.     As described herein, there is probable cause to believe that the Target Offenses have been committed and that 6 Windsor Street and the Cetrina Drive Package contain contraband, fruits, evidence and instrumentalities of those crimes.   The items to be seized constitute evidence of the commission of these criminal offenses, contraband, fruits of crimes and things otherwise criminally possessed, as well as property designed and intended for use, and that has been used, as a means of committing the Target Offenses.   A more specific list of items to be seized from 6 Windsor Street may be found in Attachment A.   Agents seek authority to search the Cetrina Drive package for controlled susbstances.

12.     This affidavit is further submitted in support of a request for the issuance of criminal complaints and arrest warrants against DEIBBY GARCIA ("DEIBBY"), JAPHET GARCIA ("JAPHET"), and Erick CRUZ ("CRUZ") (collectively the "Target Subjects").   As described herein, there is probable cause to believe that DEIBBY, JAPHET, and CRUZ have conspired to distribute and possess with the intent to distribute cocaine, in violation of 21 U.S.C. §846; that DEIBBY, JAPHET, and CRUZ have utilized a communication facility in furtherance of narcotics-trafficking offenses, in violation of 21 U.S.C. §843(b); and that DEIBBY, JAPHET, and CRUZ have possessed cocaine with the intent to distribute, in violation of 21 U.S.C. §841.

13.     The information set forth in this affidavit is based on an investigation conducted by law enforcement agents, including myself.   This affidavit does not contain every fact known to me with respect to this investigation.   Rather, it contains those facts that I believe to be necessary to establish probable cause for issuance of the requested criminal complaints and warrants to search the Subject Premises.

## BACKGROUND

14.     In late 2017, DEA began focusing on the narcotics trafficking activities of DEIBBY and his associates (the "GARCIA DTO") as a result of finding made during the investigation of another subject.

15.     DEA had previously encountered DEIBBY during a 2012 investigation, during which, as detailed below, DEIBBY was intercepted on court authorized wiretaps discussing the purchase and sale of cocaine.

## TARGET SUBJECTS

16.     **DEIBBY GARCIA** is a Hispanic male with Massachusetts license number #Sxxxx6862 and a date of birth of xx-xx-1982, who is now believed to reside at 6 Windsor Street, Apt. #1, Worcester, Massachusetts.   Agents believe that to be the residence of DEIBBY GARCIA because of ongoing intercepts[1] and surveillance.   Since January 3, 2018, agents

---

[1] On January 5, 2018 at approximately 4:38pm, DEIBBY received an incoming call on TT6 from an unknown male using the phone assigned (774) 696-3050 ("UM3050"), with an associated subscriber name "███████████" and an associated address of "███████████ Worcester, MA."   During the call, UM3050 asked, "Are you freezing or are you at the beach?," and DEIBBY replied, "I'm here laying down at Prieto's house."   UM3050 asked, "At the new apartment?," and DEIBBY responded, "Yes."   (I believe that during this conversation, DEIBBY is representing that he is living with his brother JAPHET and that "Prieto" is a reference to JAPHET).   This belief has been confirmed by agents more recent observations of vehicles registered to DEIBBY in the area of 6 Windsor.   For instance, a vehicle registered to DEIBBY was observed to be parked overnight in the area of that address on January 8, 2018.   In other calls detailed below, DEIBBY is intercepted stating and/or texting that he is "at his brothers" or words to that effect.   On January 15, 2018, at approximately 8:53pm, DEIBBY called (508) 757-6040, a phone subscribed to "Jim's Pizza, 98 Belmont St, Worcester, MA."   In the call, which lasted one minute and fourteen seconds, DEIBBY places an order for a pizza and is asked where it is going.   At that point, DEIBBY replied, 6 Windsor Street, Apartment 1.   When asked for a phone number, DEIBBY provided 774-434-9011 (the number for TT6).   In addition, as noted in the section addressing physical surveillance, DEIBBY arranged to sell approximately 250 grams of cocaine at that location on January 9, 2018.  *See infra.*   Finally, publically available databases reveal that a T-Mobile phone, subscribed in the name JAPHET GARCIA

conducting surveillance at that location have observed DEIBBY entering and exiting 6 Windsor

on a daily basis.   DEIBBY has a Massachusetts criminal history which includes: (1) a

conviction for receiving stolen property in 2005 for which he received a $150 fine; and (2) an

October 2005 conviction for attaching motor vehicle plates for which he received a $100 fine.

17.   **ERICK CRUZ,** is a United States Postal Service ("USPS") Letter Carrier who is

believed to reside at 8 Chrome Street, Worcester, Massachusetts. As detailed below CRUZ has

conspired with DEIBBY to arrange the delivery of packages containing multiple kilograms of

cocaine to addresses located on the USPS route of CRUZ. This allows CRUZ to intercept

delivery of the packages before they are delivered to the addresses.

18.   **JAPHET GARCIA** is a Hispanic male with Massachusetts license number

#Sxxxx0160 and a date of birth of xx-xx-1985, who resides at 6 Windsor Street Apt. 1,

Worcester, Massachusetts.   Since January 3, 2018, agents conducting surveillance have

observed JAPHET entering and exiting that location on a daily basis.   Further, after receiving

information that JAPHET would be taking a flight, on morning of December 18, 2017, agents

established surveillance in the area of 6 Windsor Street, Worcester, Massachusetts.   Agents

observed JAPHET and an unknown Hispanic male exit 6 Windsor Street carrying a red suitcase

and a red duffel bag. Both items were put into a Toyota Forerunner registered to JAPHET (at 6

Windsor Street, Worcester, Massachusetts).   The two were then followed to Bradley Airport.

JAPHET is believed to be the brother of DEIBBY.   I believe that JAPHET is a member of the

GARCIA DTO responsible for selling cocaine and transporting currency.   As further detailed

(DEIBBY's brother), has an associated address of 6 Windsor Street, Apartment #1, Worcester,
Massachusetts.

below, in or around December 7, 2017, JAPHET also attempted to receive a delivery of a package found to contain approximately three kilograms of cocaine.

19.     **UNIDENTIFIED MALE 2671** ("UM2671") – UM2671 is believed to be a source of cocaine for DEIBBY GARCIA.

## OTHER IDENTIFIED INDIVIDUALS

 s a Hispanic male with Massachusetts license number #Sxxxx3454 and a date of birth of xx-xx-1980, who is believed to reside at _____ Worcester, Massachusetts.   I believe that _____ is a transporter of cocaine for the GARCIA DTO.   As detailed below, on or about December 7, 2017, _____ ttempted to receive a delivery of a package found to contain approximately three kilograms of cocaine from Puerto Rico.   I further believe that _____ delivered 250 grams of cocaine that was sold by DEIBBY on January 9, 2018 at 6 Windsor Street.

## TARGET TELEPHONE #6

21.     On December 29, 2017, this Court (Saris, J.) authorized the interception of wire and electronic communications occurring over the T-Mobile cellular telephone assigned call number (774) 434-9011 and bearing International Mobile Subscriber Identifier ("IMSI") 310260497020136, with an associated subscriber, DEIBBY GARCIA, and an associated address of 8 Prospect Street, Webster, MA 01570 (hereinafter "Target Telephone #6" or "TT6").

22.     Interception of TT6 commenced on January 3, 2018 and is scheduled to end on February 1, 2018.

23.     Briefly, as detailed below, interceptions on TT6 have shown that DEIBBY is distributing cocaine to a number of individuals in the Worcester Area and that cocaine being shipped to DEIBBY from a cocaine supplier in Puerto Rico.

24.     Intercepts have further shown that CRUZ is conspiring with DEIBBY for packages of cocaine shipped from Puerto Rico to be addressed to homes on CRUZ's USPS delivery route so that CRUZ can intercept delivery of the packages, and, in turn, deliver the cocaine to DEIBBY.

## DEIBBY GARCIA IS THE USER OF TT6

25.     During authorized wire and electronic interceptions of a phone used by Sergio Hernandez in 2012,[2] DEIBBY was intercepted discussing the purchase and sale of hundreds of grams of cocaine.

26.     By way of specific example, on June 27, 2012, at approximately 6:45pm, an individual utilizing the phone assigned number (978) 320-0393 was intercepted speaking to Hernandez.   During that call, the user of the 0393 phone and Hernandez discussed what agents believed to be the potential purchase of over 200 grams of cocaine. Specifically, during the call, the user of the 0393 phone stated, "I find you something, but it's a little high, 42 and they only got 2-60."   Hernandez responded, "At 42?," and the user of the 0393 phone stated, "Yeah, I think the little he can go is 41."   Hernandez replied, "Fuck that.   I'm not paying that much.   He can keep it."   The user of the 0393 phone continued, "Alright.   Let me call him, if he can go

---

[2] Hernandez pled guilty to federal narcotics charges and has admitted being the user of the phone that was the subject of the wiretap order.    Hernandez is currently serving a 162 month sentence imposed for federal narcotics violations.   *See United States v. Sergio Hernandez, et al,* 12-cr-40055-TSH (D.Mass.).

like 40…", and Hernandez responded, "Yeah, yeah."   The user of the 0393 phone then stated, "he has like 260 or 265."   (Agents involved in that investigation interpreted these calls as reflecting efforts by the user of the 0393 phone to arrange Hernandez's potential purchase of approximately 260 grams of cocaine from an unknown third party.   The user of the phone is proposing to find a seller, but notes that the price would be high – "I find you something, but it's a little high."   Agents believed that the references of "42," "41," and "40" were to the price of the cocaine in thousands of dollars per kilogram.   Here, agents believed that Hernandez had refused to buy at $42,000 per kilogram, - "At 42?" "Fuck that" - but agreed to possibly purchase approximately 260 grams of cocaine at a price of $40,000 per kilogram – "if he can go like 40" and "Yeah.   Yeah").

27.     On June 29, 2012, Hernandez spoke again with the user of the 0393 phone. During a call at approximately 11:58am, Hernandez told the user of the 0393 phone, among other things, "I got to come bring you this money nigga."   Later that day, at approximately 1:52pm, Hernandez spoke to the user of the 0393 phone and stated, "[w]here do you want to meet me?   You want to some meet me at Austin Street or you want me to come see you?"   The user of 0393 replied, "Yeah, come to me," and Hernandez asked, "Where you at?" The user of 0393 replied, "The shop."   Hernandez then stated, "Alright.   Ill be over there."   At approximately, 2:35pm, Hernandez called the user of the 0393 phone and stated, "You want me to come in or you going to come out?" and the user of 0393 stated, "Ill go out."   Hernandez continued, "Alright.   I'm turning down the road right now," and the user of 0393 replied, "Alright."   At approximately 2:45pm that day, agents conducting surveillance observed Hernandez pull up in front of a shop at the corner of Albany Street and Muskeego Street in

Worcester, Massachusetts.   Hernandez exited his vehicle and entered the shop, Extreme Auto.

A few moments later, Hernandez exited and left the area in his vehicle.   Approximately five

minutes later, a White Mazda (MA Reg. 461SB4), occupied by two unknown females, pulled up

in front of Extreme Auto.   That vehicle was registered to "Deibby Garcia" with an associated

address of 90 Sterling Street in Worcester, Massachusetts.   After the Mazda pulled up, DEIBBY

(identified by agents based upon their observations and comparison with an RMV photo) walked

out of the shop and handed an unknown item to the females, who then drove away.   (Agents

involved in that investigation believe that on June 29, 2012, Hernandez delivered money to

DEIBBY, the user of the 0393 phone, inside the shop).

28.     Interpreters working on translating the intercepted communications in this matter

have listened to recordings of the voice of the individual captured speaking to DEA TARGET X[3]

on court authorized wiretaps using TT6 that occurred between September 29, 2017 and today.

They have compared those recordings to the voice of the individual intercepted in 2012 on the

Hernandez wiretap and believe that it is the same individual speaking on all of those recordings.

29.     TT6 is subscribed to in the name "Deibby Garcia" with an associated address of

"8 Prospect Street, Webster, MA 01570."

30.     As detailed below, on January 9, 2018, DEIBBY used TT6 to arrange the sale of

250 grams of cocaine at 6 Windsor Street, Worcester, Massachusetts and surveillance

corroborated that event.

---

[3] The identity of DEA TARGET X is known to this Affiant.   The identity of DEA TARGET X
is being withheld to protect the integrity of the ongoing investigation of DEA TARGET X.   The
user of TT6 (DEIBBY) was intercepted on a number of occasions speaking to DEA TARGET X
during court authorized interceptions between September 29, 2017 and today.

31.     On January 15, 2018, DEIBBY arranged for the delivery of a pizza to 6 Windsor Street, Apartment 1, utilizing TT6.

32.     DEIBBY has stated in numerous intercepted communications that he is at his brothers, or at Prieto's (believed to be a nickname for his brother, JAPHET) and DEIBBY has been repeatedly observed coming and going from the 6 Windsor Street address on a near daily basis since January 3, 2018.

33.     When information led agents to believe that JAPHET would be taking a flight, agents conducting surveillance observed JAPHET exit 6 Winsor Street, Worcester, Massachusetts with a suitcase and travel to an airport.   I believe that an individual taking a flight is most likely to pack a suitcase for that trip at their residence, not some other location.

## DECEMBER 7, 2017 SEIZURE OF THREE KILOGRAMS OF COCAINE SHIPPED FROM PUERTO RICO



34.     On December 7, 2017, the United States Postal Inspection Service ("USPIS") received information from the MSP, advising USPIS that a package being delivered to ▇ Pleasant Valley Drive, Worcester, Massachusetts would contain an unspecified quantity of a controlled substance. According to MSP, the package would be addressed to ▇▇▇▇▇▇ ▇▇▇▇▇▇ Pleasant Valley Drive, ▇▇▇▇▇ Worcester, MA, and would bear the USPS tracking number "▇▇▇▇▇▇▇▇ 1340 63."

35.     USPIS was able to identify a package meeting that description, specifically, a USPS Priority Mail package bearing tracking number ▇▇▇▇▇▇▇▇ 1340 63, addressed to "▇▇▇▇▇▇▇▇ LEASANT VALLEY DR▇▇ ▇▇▇▇ Worcester, MA

01605," and bearing a return address of "⬛⬛⬛⬛⬛⬛ URB. SUNVILLE CALLE-18 Y-11, TRUJILLO ALTO P.R 00976."

36.     A postal inspector then contacted a USPS supervisor at the Worcester Main Post Office located at 4 East Central Street, Worcester, who assisted the inspector in locating the package.   According to USPS databases and tools, the package was at the time out for delivery with the USPS mail carrier responsible for delivery.   According to the USPS supervisor, the mail carrier did not deliver the package because the apartment number of "49" is not a valid apartment at ⬛⬛⬛⬛⬛⬛ Worcester, MA."   Further, according to the USPS supervisor, the mail carrier scanned the package as Insufficient Address "IA" due to the address containing an invalid apartment number of ⬛⬛.

37.     On that same day, the USPS supervisor retrieved the package from the mail carrier and returned it to the Worcester Main Post Office, where USPIS took custody of it. After a narcotics sniffing dog alerted on the package, a federal search warrant was obtained (See 17-mh-4313-DHH).   A search of the package revealed approximately three kilograms of a substance that field tested positive for the presence of cocaine.

38.     On December 8, 2017, DEA agents reviewed a video from the Worcester Main Post Office on Central Street provided to DEA by USPIS.   In the video two Hispanic males, who agents believe to JAPHET and ⬛⬛⬛⬛⬛⬛ based upon agents' observations of those individuals during surveillance, are depicted entering the facility and making contact with postal clerks.   USPIS reported to DEA that the two individuals depicted in the video had inquired about the package that had been found to contain approximately three kilograms of

cocaine.    The clerks had reportedly told the two males that because the package was

undeliverable it had been returned to the sender address.

### January 3, 2018 Discussions With Source

39.      On January 3, 2018 at approximately 3:43p.m, DEIBBY received an incoming

call on TT6 from an unknown male using (787) 525-7308 ("UM7308").   During the call

UM7308 stated, "Listen, your cousin came this morning, but I still didn't have the "billetes"(bills,

tickets). They just brought it, I am preparing it now. So call him and tell him to come get it

tomorrow."   DEIBBY responded, "Okay, I'll tell him." (I believe that UM7308 is explaining

that DEIBBY's cousin had come by on the morning of January 3, 2018 – "your cousin came this

morning" – but UM7308 did not yet have the cocaine – "I still didn't have the "billetes"(bills,

tickets)."   I further believe that UM7308 is explaining that, as the call is occurring, he is

preparing the cocaine – "They just brought it, I am preparing it now" – and, that UM7308 is

telling DEIBBY to have his cousin pick up the drugs tomorrow – "So call him and tell him to

come get it tomorrow.   I further believe that DEIBBY has agreed to do so – "Okay, I'll tell

him.")

40.      Later in the conversation, UM7308 stated, "Okay, he told my wife that you would

let him know because I wasn't here when he came. They just brought it, I prepared it already and

I have it there. I am preparing the rest, so you can tell him to come get them tomorrow that I will

have them there, okay?," and DEIBBY responded, "Okay."   (I believe that UM7308 is

explaining that DEIBBY's cousin had talked to UM7308's wife because UM7308 hadn't been

home – "he told my wife that you would let him know because I wasn't here[4] when he came" – and that UM7308 is reiterating that the drugs had just arrived and were being prepared – "They just brought it, I prepared it already and I have it there. I am preparing the rest, so you can tell him to come get them tomorrow that I will have them there."   I further believe that UM7308 is directing DEIBBY to have his cousin meet UM7308 at a stash house, or some other location where the drugs are prepared for sale – "I have it *there*. I am preparing the rest, so you can tell him to come get them tomorrow that I will have them *there*.")

### NEGOTIONS FOR THE SALE OF 250 Grams of Cocaine at 6 Windsor on January 9, 2018

41.    On January 9, 2018 at approximately 10:13am, DEIBBY received an incoming text from an unknown male[5] using (508) 723-6900 ("UM6900"), a phone subscribed in the name



with an associated address of "                    . Worcester, MA." The text read, "Hit me if any."   (I believe that UM6900 is asking DEIBBY to contact him – "hit me" – if DEIBBY has cocaine to sell – "if any.")   DEIBBY responded, "Papi my friend got something nice but he want cash that's the thing.   (I believe that DEIBBY is stating that he has a source who can sell cocaine – "my friend got something nice" – but that the supplier will want cash payment up front for the drugs – "but he want cash that's the thing.")   At approximately 10:14am, DEIBBY received an incoming call from UM6900.   During the call UM690 stated,

---

[4]  I believe that UM7308 is referring to two different locations.   The first location is where UM7308 is calling from - "here" – most likely UM7308's home, and the second location is the location where the drugs are prepared – "there" – and the location UM7308 is asking DEIBBY to direct his cousin to pick up the drugs.

[5]  As explained below, I believe that UM6900 is                                    .

"Yo, so you said you need some, some paper?," and DEIBBY replied, "No no no no no, my friend got something, right? But, he want cash, you know? He's not like me, like I can front it to you."   (I believe that UM6900 is asking whether DEIBBY will need cash up front for the drugs – "so you said you need some, some paper."   I further believe that DEIBBY is explaining that DEIBBY would not need cash up front if he were the one selling – "I can front[6] it to you" – but that the friend requires payment up front– "my friend got something, right? But, he want cash, you know? He's not like me.")   UM6900 then stated, "Oh, somebody else."   (I believe that UM6900 is explaining he now understands that DEIBBY is proposing that someone else sell the drugs to UM6900.)   DEIBBY then said, "Yeah, but he's fucking nice, nice, little nice," and UM6900 stated, "Hm, all right, well, all right. I'll make sure, I'll make sure," DEIBBY stated, "Check how much you need for now, so," and UM6900 continued, "All right. You know what I need. This..." DEIBBY then interrupted, "Yeah, yeah, yeah, but um, bring cash, because my friend just, you know," and UM6900 stated, "No."   DEIBBY continued, "until mine gets in," and UM6900 replied, "All right, lemme just go to," and DEIBBY stated, "All right."   (I believe that during this exchange, DEIBBY is representing that the drugs his "friend" is selling are high quality – "he's fucking nice" – and is asking how much UM6900 would need, "check how much you would need for now."   I further believe that DEIBBY is proposing that UM6900 buy only what UM6900 needs in the immediate future because DEIBBY expects to have narcotics of his own to sell – "until mine gets in.")

---

[6] In my training and experience the term "front," is used when a narcotics supplier provides drugs to another individual with the expectation that the supplier will receive payment once the drugs are sold.

42.     At approximately 10:29am on January 9, 2018, DEIBBY received another call
from UM6900.   During the call, UM6900 stated, "I'm, I'm a go right ahead outside and try to
grab a couple dollars. I'm probably gonna [U/I], like, like 250 tickets," and DEIBBY replied,
"250?"   (I believe that UM6900 is stating that he wishes to buy 250 grams – "like 250 tickets."
I further believe that UM6900 is explaining that he will collect the cash needed – "I'm a go right
ahead outside and try to grab a couple dollars."   I further believe that DEIBBY is confirming the
amount of 250 grams– "250?").   UM6900 continued, "Yeah, that's, that's what I'm trying to um,
scrape up real quick."   (I believe that UM6900 is confirming the 250 gram order - "yeah" – and,
that UM6900 will try to collect the necessary cash – "that's what I'm trying to um, scrape up real
quick.")   DEIBBY continued, "Alright, um, I'll call my buddy right now, um, I'm gonna let him
know so he can bring it me," and UM6900 stated, "All right, [U/I]."   (I believe that DEIBBY is
stating that he will contact the individual with narcotics to sell and have the narcotics brought to
DEIBBY – "I'll call my buddy right now, um, I'm gonna let him know so he can bring it [to]
me.")

43.     At approximately 5:58pm, UM6900 texted DEIBBY, "B up there by 730 call wen
close."   (I believe that UM6900 is confirming that UM6900 will meet DEIBBY to purchase 250
grams, as described in prior communications, that UM6900 will arrive at DEIBBY's location by
7:30pm, and that UM6900 will call DEIBBY when he is close.)   At approximately 6:01pm,
DEIBBY texted back, "Ok let me call my boy," and "how much."   UM6900 replied by text,
"Wat we talked earlier." (I believe that DEIBBY is relating that he will contact the individual
who has cocaine to sell – "Ok let me call my boy" – and that DEIBBY and UM6900 confirmed

the amount of the sale (250 grams) – "how much," and "Wat we talked earlier."   I further

believe that, at this point, DEIBBY believes that the deal will occur around 7:30pm.)

44.    At approximately 6:52pm, UM6900 texted, "on highway," and DEIBBY replied,

"Ok."   (I believe that UM6900 and DEIBBY are communicating concerning the timing of the

expected sale).

45.    At approximately 7:30pm, agents observed a 2007 Toyota Minivan ▓▓▓▓▓▓)

arrive and park across the street from 6 Windsor Street.   ▓▓▓▓▓▓▓▓▓▓was then

observed exiting the vehicle and entering 6 Windsor Street.   ▓▓▓▓▓▓exited the premises at

approximately 9:15pm.   (I believe that ▓▓▓▓▓▓▓ was the individual supplying the 250

grams to be sold to UM6900.   I further believe this is why ▓▓▓▓▓▓arrived at 7:30pm,

when discussion first suggested the deal would occur).

46.    At approximately 9:01pm, UM6900 texted DEIBBY, "we're u at" and "Just got

out here Papi."   (I believe that UM6900 is asking for DEIBBY's location – "w[h]e're u at" –

and is informing DEIBBY that UM6900 is nearby – "just got out here Papi.")   At approximately

9:02pm, DEIBBY texted, "My brother's house," and UM6900 texted back "K."   (I believe that

DEIBBY is informing UM6900 that DEIBBY is at JAPHET's house, 6 Windsor Street – "my

brother's house" – and UM6900 is acknowledging that he understands – "K.")

47.    At approximately 9:43pm, DEIBBY received an incoming text from UM6900,

"bout to pull up call u wen I'm outside."   (I believe that UM6900 is informing DEIBBY or his

imminent arrival at 6 Windsor Street.)

48.    At approximately 10:04pm, DEIBBY received an incoming call from UM6900.

During the call, UM6900 stated, "Yo, I am outside," and DEIBBY replied, "Alright, my

b[r]other is going out."   (I believe that UM6900 is informing DEIBBY that UM6900 had arrived at 6 Windsor Street - "Yo, I am outside" - and that DEIBBY has indicated the JAPHET is on the way out to meet UM6900 – "Alright, my b[r]other is going out.")

49.     At approximately 10:04pm, agents observed a 2018 Chevy Cruz (     ) pull onto Windsor Street, circle the block, then pull into the rear driveway of 6 Windsor Street. The sole occupant was observed to exit the vehicle wand walk to the front of the residence.   At approximately 10:15pm, the occupant of the vehicle was observed exiting 6 Windsor Street and returning to the vehicle.   The vehicle was then followed to     Street in Worcester, where it parked in front of the residence.   Soon after, at 10:25pm, the vehicle was followed to     Street in Worcester.   There, the operator exited the vehicle and entered the residence.   At approximately 10:45pm, three individuals exited the residence, entered the Chevy Cruz and departed.

50.     The vehicle was then stopped for motor vehicle violations by a MSP Trooper. The operator was identified as      , the front seat passenger was identified as     ,[7]and, the rear seat passenger was identified as      During questioning,      and    described themselves as boyfriend/girlfriend.      was found to be operating without a revoked license and was issued a criminal summons.

51.     Agents that had been conducting surveillance earlier than night at 6 Windsor Street reviewed a RMV photograph of     and identified him as the

---

[7]  The phone utilized by UM6900 was subscribed in the name "    ."

individual who was observed exiting the Chevy Cruz and entering 6 Windsor Street at

approximately 10:04pm.   I therefore believe that UM6900 is ███████████████ .

52.     I further believe that during the time that ███████████████ was present at

6 Windsor Street, DEIBBY distributed 250 grams of narcotics to ███████████████ in

exchange for cash.

### January 15, 2018 Seizure of Three Kilograms of Cocaine And Delivery of a Second Package Suspected to Contain Cocaine

53.     On January 9, 2018, at approximately 3:10pm, DEIBBY received an incoming

call on TT6 from an unknown male utilizing 787-309-2671 ("UM2671"), the subscriber for

which is unknown.   During the call UM2671 stated, "We're over here, We're over here."

DEIBBY replied "Okay, the Carter has me nuts."   UM2671 then stated "The what? The

Carter?" to which DEIBBY replied "Yeah."   (I believe, based upon this call and subsequent

events detailed below, that during this call, UM2671 is representing that he is ready to ship

narcotics – "We're over here, We're over here."   I further believe that DEIBBY is complaining

that CRUZ, a postal letter carrier, who is part of the scheme to arrange delivery of the narcotics

to DEIBBY, is driving DEIBBY nuts – "the Carter has me nuts."   "The Carter" is a Spanish

term for a postal carrier).   UM2671 then asked, "Nah, set up for... What should we drop?

Should we drop 2?" DEIBBY then replied "Yeah."   (I believe that UMS2671 is proposing to

ship two packages – "What should we drop? Should we drop 2?" – and that DEIBBY, agreed,

"Yeah.").   UM2671 then stated, "Set up for 2 to head out on Friday. Ask him if Friday whether

he can on Thursday or Friday."   DEIBBY responded "I'm going to call so he can drop by later.

We'll talk over the phone, and then I'll talk to you in the evening."   (I believe that during this

portion of the conversation, UM2671 is asking DEIBBY to schedule the delivery of two

packages with CRUZ and to ask CRUZ if CRUZ can handle delivery Thursday or Friday – "Set

up for 2 to head out on Friday. Ask him if Friday whether he can on Thursday or Friday."   I

further believe that DEIBBY is representing that he will call CRUZ, and will call UM2671 back

– "I'm going to call so he can drop by later. We'll talk over the phone, and then I'll talk to you in

the evening."   I further believe that DEIBBY and UM2671 were discussing sending out

packages on "Friday," January 12, 2018).

54.     On January 9, 2018, at approximately 3:29 pm, after talking with UM2671,

GARCIA placed an outgoing call Erick CRUZ at (774) 535-7757 ("UM7757"). The subscriber

for that phone is listed as Erick CRUZ, 8 Chrome Street, Worcester, MA.   Erick CRUZ works

as a USPS Letter Carrier and CRUZ's route as a USPS letter carrier includes the two addresses

to which the suspect packages described below were addressed.   According to the RMV, Erick

CRUZ, the letter carrier, resides at 8 Chrome Street, Worcester, Massachusetts.   For these

reasons, and based upon events detailed below, I believe that the user of (774) 535-7757 is Erick

CRUZ.

55.     During that call, DEIBBY stated, "When you get out, drop by the apartment

here," and CRUZ replied, "Which apartment?"   DEIBBY continued, "Where you saw me last,"

CRUZ replied, "Oh to drop by there, you mean?," and DEIBBY stated, "Yeah."   (I believe that

DEIBBY is asking CRUZ to come by 6 Windsor Street).   CRUZ then asked, "Oh, but do you

need a day, or no?" and DEIBBY replied, "Yeah, that's why."   (I believe that CRUZ is asking if

DEIBBY needs a day for a delivery of cocaine – "do you need a day, or no" – and that DEIBBY

stated that would be the purpose of the meeting - Yeah, that's why."   CRUZ, then stated, "Oh,

but to check now," and DEIBBY asked, "Oh, you work Tuesday?," CRUZ replied, "What's

that?," and DEIBBY asked, "Do you work Monday and Tuesday?"   (Based upon these calls,

subsequent calls, and subsequent events, detailed below, I believe that CRUZ and DEIBBY are

attempting to schedule a date on which packages of cocaine can be shipped to DEIBBY at

addresses on CRUZ's USPS delivery route, and, that DEIBBY is proposing delivery on Monday

or Tuesday - "Do you work Monday and Tuesday?").   CRUZ then responded, "Monday is a

holiday," and DEIBBY replied, "Okay."   CRUZ continued, "Um, Monday is a holiday... And

the rest of the week I work, I think."   DEIBBY stated, "So then...," and CRUZ replied,

"Tuesday onwards, I work."   (I believe that CRUZ is reporting that he will be working on

Tuesday, January 16, 2018 onward the following week, and, that packages could be scheduled to

arrive then – "Um, Monday is a holiday... And the rest of the week I work, I think" and "Tuesday

onwards, I work.").

56.     DEIBBY then stated, "Today is Tuesday, right?," and CRUZ replied, "Yeah,

today is Tuesday. And I'm free on the weekend."   DEIBBY stated, "All right, um, I'll see [ph]

you Tuesday," and CRUZ replied, "For Tuesday."   (I believe that in this portion of the

conversation, DEIBBY and CRUZ have agreed that the delivery of cocaine will occur on

Tuesday, January 16, 2018.)   DEIBBY then stated, "Two? [Voices Overlap]" and CRUZ

replied, "Two. All right. All right."   DEIBBY stated, "All right," and CRUZ stated, "All right."

(I believe that in this portion of the conversation, DEIBBY and CRUZ have agreed that two

packages of cocaine will be delivered on Tuesday, January 16, 2018.)

57.     On January 9, 2018, DEIBBY received an incoming call from CRUZ, using (774)

535-7757, on TT6.   During the call, CRUZ asked, "Do you need me to stop by still or do I send

that?," and DEIBBY replied, "Send that."   CRUZ asked, "Huh," and DEIBBY stated, "No it's fine. Send that buddy."   (I believe that CRUZ is asking DEIBBY if DEIBBY still wishes CRUZ to come by 6 Windsor Street, or, if CRUZ should just send the addresses to which the packages should be sent[8] – "Do you need me to stop by still or do I send that."   I further believe that DEIBBY has informed CRUZ just to send the addresses to which the packages should be addressed – "No it's fine. Send that buddy."). CRUZ then stated, "You said for Tuesday, then, right? [Voices Overlap]" and DEIBBY replied, "Yeah, yeah."   (I believe that CRUZ is confirming delivery on Tuesday, and the DEIBBY has agreed).   CRUZ continued, "I would have to... Remember Monday is a holiday, so we'd have to send it on Friday I figure, right?," and DEIBBY replied, "Yeah."   CRUZ continued, "Or Saturday. Friday or Saturday. Or he could probably Friday in the afternoon so that it... you know.," and DEIBBY replied, "All right." CRUZ then stated, "All right, then." (I believe that during this portion of the call, CRUZ is directing DEIBBY concerning when to ship the package so that it will arrive on Tuesday, January 16, 2018 – "I would have to... Remember Monday is a holiday, so we'd have to send it on Friday I figure, right?" "Or Saturday. Friday or Saturday. Or he could probably Friday in the afternoon so that it... you know" - and that DEIBBY has agreed – "All right.")

58.     On January 11, 2018, at approximately 7:21 am, DEIBBY received an incoming text over TT6 from CRUZ, which read "55 Grace Cir marlborough ma 01752 7 Cetrina Dr Marlborough ma 01752." (I believe these are the addresses which CRUZ is directing that DEIBBY should address the packages of cocaine.   I have spoken to US Postal Inspectors and

---

[8] I believe my interpretation is informed (and confirmed) by subsequent communications and events detailed below.

they have confirmed that these addresses are located on the assigned route of letter carrier

CRUZ).   At approximately 7:21am, DEIBBY texted CRUZ, "ok."   (I believe that DEIBBY was

acknowledging receipt of the addresses to which the cocaine should be shipped).

59.     On January 11, 2018, at approximately 10:36 am, DEIBBY received an incoming

call on TT6 from UM2671. During the conversation UM2671 stated, "Oh okay okay.   Alright,

then.   Send that to me," and DEIBBY replied, "Alright, I'll send through here."   (I believe that

UM2671 is aksing DEIBBY to send the addresses to which the cocaine should be shipped to

UM2671 – "send that to me" – and that DEIBBY has agreed he will send those addresses –

"Alright, I'll send through here.")

60.     Immediately following this conversation, DEIBBY sent an outgoing text to

UM2671 which read "55 Grace cir Marlborough MA 01752 7 Cetrina Dr Marlborough MA

01752."[9]

61.     On January 12, 2018, I was informed by US Postal Inspectors that two packages,

both of which originated in San Juan, PR, had been mailed earlier that day destined for delivery

---

[9] Other intercepts confirm that the Tuesday delivery would be cocaine that DEIBBY would sell.
For example, on January 11, 2018 at approximately 7:04pm, DEIBBY received a call from an
unknown male "Billy" at (774) 520-5501.   The caller identified himself as "Billy" and asked,
"Tell me. Is there food?"   (I believe that Billy is asking if DEIBBY has cocaine to sell.   Food is
a common code phrase for narcotics.)   DEIBBY first stated, "Damn, no.   Ran out of almost all
of it just now," and Billy stated, "Damn, I needed one and a half."   (I believe that DEIBBY is
explaining that he does not have product to sell.   I further believe that Billy is asking to buy one
and a half kilograms of cocaine). Later DEIBBY stated, "For Tuesday" and Billy later replied,
"Alright, then. You already have one and a half sold. Alright, call me when it's there."   (I
believe that DEIBBY is explaining that he will have cocaine for sale Tuesday, January 16, 2018,
the day that the delivery DEIBBY has arranged with CRUZ and UM2671 will arrive.   I further
believe that Billy is proposing to buy one and half kilograms of that delivery).

to "55 Grace Circle, Marlborough, MA 01752" and also to the 7 Cetrina Drive, Marlborough,

Massachusetts, address.

62.     On January 13, 2018, at approximately 5:27 pm, DEIBBY received an incoming

call from CRUZ.   During the call DEIBBY stated, "Tuesday," and CRUZ asked, "Did you do

that already?"   DEIBBY stated, "Yeah," and CRUZ asked, "both?"   DEIBBY stated, "yeah,"

and CRUS continued, "All right, all right, keep an eye out." GARCIA stated, "all right buddy,"

and CRUZ replied, "All right." (I believe that during this call, DEIBBY and CRUZ confirmed

that two packages would be delivered Tuesday - "Did you do that already?" "both?" – and that

CRUZ would be looking for them – "All right, all right, keep an eye out.")

63.     US Postal Inspectors tracked both packages and took custody of them upon their

arrival in Massachusetts.

### Search of the Package Addressed to 55 Grace Circle

64.     On or about January 15, 2018, US Postal Inspectors arranged for the package

addressed to "55 Grace Circle, Marlborough, MA 01752" to be examined by a trained narcotics

sniffing canine, who positively alerted to the package. Thereafter, a federal search warrant was

obtained for that package.   (*See* 18-mj-4012-DHH).

65.     A search of the package revealed, among other things, a white powder substance

that field tested positive for the presence of cocaine. The weight of the powder, with its

packaging, was approximately 3,150 grams (over three kilograms).

## Intercepts Concerning the Package Addressed to Cetrina Drive

66.     On the morning of January 16, 2018, US Postal Inspectors arranged for the second package, addressed to "Vanessa Mendez, 7 Cetrina Dr, Marlborough, MA 01752," to be placed in the ordinary deliveries for the route assigned to CRUZ.   Though, it took some time to make that arrangement so the package was not immediately provided to CRUZ upon his arrival for work.[10]

67.     At approximately 7:00am on January 16, 2018, DEIBBY texted CRUZ, "Buddy, is that there already?"   (I believe that DEIBBY is asking if the packages had arrived).

68.     At approximately 8:22am, DEIBBY called CRUZ.   During the call DEIBBY asked, "Nothing?" and CRUZ replied, "Nothing."   (I believe that DEIBBY is asking if the packages have arrived, and CRUZ is stating that they had not). DEIBBY continued, "It hasn't arrived there or anything?" and CRUZ replied, "No. I don't know." DEIBBY stated, "Damn," and CRUZ replied, "Wait until tomorrow and see if it arrives."   DEIBBY stated, "Um-huh," and CRUZ continued, "The problem is that I have another route tomorrow."   (I believe that during this portion of the conversation, CRUZ and DEIBBY are discussing that the package had not yet arrived.   I further believe that CRUZ is telling DEIBBY to be patient about delivery, and is cautioning DEIBBY that CRUZ has a different delivery route the following day). DEIBBY continued, "You know what has to be done," and CRUZ replied, "Yes. Damn, I get anxious.[Chuckles]."   DEIBBY continued, "Yeah. I'm going to tell him to send me the scans [ph]," and CRUZ replied, "Okay." (I believe that during this portion DEIBBY is advising CRUZ

---

[10] Several calls occurred between DEIBBY and CRUZ the morning of January 16, 2018 that were not intercepted as those calls occurred prior to the times when calls were being monitored.

that he will have to make some kind of alternative arrangements to pick up the package and that those arrangements are of a kind that makes CRUZ nervous.   I further believe that DEIBBY is going to contact someone, likely UM2671, to get tracking information for the packages).

69.     At approximately 8:24am, DEIBBY called UM2671 at (787) 309-2671 and stated, "Send me the label, so I can check it."   UM2671 replied, "I was thinking on that, but… it looks like it went out but…"   (I believe that DEIBBY is asking UM2671 to provide tracking information for the packages.   I further believe that UM2671 is checking the packages and relating what the tracking system revealed).[11]   UM2671 continued, "Now. They just put it. They put it at 7:33, at the buddy's."   DEIBBY replied, "Over here?"   UM2671 stated, "It shows the zip code. Yeah at 7:33, where he is. I told you, that is at their truck/van/suv and they haven't brought it down/out."   DEIBBY replied, "Okay."   UM2671 stated, "At least one (1), they already scanned one (1). It arrived at 7:33 today, let's see."   DEIBBY stated, "Um." UM2671 stated, "Today at 7:33, yeah. At Marlboro post office."   DEIBBY stated, "Okay, I'm going to call him now and tell him to check."   UM2671 stated, "It says delivery. Listen it says, express delivery for today. One (1), the other one doesn't come up."   DEIBBY stated, "Okay, let me [Voices Overlap]," UM2671 stated, "I think it is probably next to him too," and DEIBBY stated, "Yeah. Let me call him."   (I believe that UM2671 was checking the status of the packages, reported to DEIBBY that one had arrived at CRUZ's location in Marlborough, and DEIBBY was going to call CRUZ to determine the packages' status.)

---

[11] There was a system malfunction during the conversation.   Some statements may have been missed.

70.     At approximately 8:25am, DEIBBY called CRUZ at (774) 535-7757, and stated, "He just checked and it says that one (1) was scanned there at around 7 somethin," CRUZ replied, "Really?" and DEIBBY stated, "Yes."   CRUZ stated, "Um.. let me check again." DEIBBY continued, "And the other one has to be there too."   CRUZ, stated, "Oh yeah, one (1) it's here. What does the other one say?"   DEIBBY stated, "The other one too. The other one has to be there," and CRUZ asked, "Does it say the same thing?"   DEIBBY asked, "No, it hasn't been scanned. They haven't said anything about the other one."   CRUZ continued, "Oh, okay. At least there is one (1) there" and "I'll check for the other one."   (I believe that CRUZ and DEIBBY are discussing the package that was delivered by US Postal Inspectors to CRUZ for delivery).

71.     At approximately 8:26, DEIBBY called UM2671 and they discussed that one of the packages had arrived.

72.     During later intercepts, CRUZ and DEIBBY arranged for a female to pick up the package from CRUZ.

73.     At approximately 1:45pm, agents observed CRUZ meet with a female in Marlborough in the area of Dawes Street, and exchange an item.

74.     At approximately 1:50pm, an unidentified[12] female called DEIBBY to say words to the effect, "Its on its way."   She also texted word to the effect, "tell Prieto I'll be on my way."

75.     At approximately 1:55pm, agents stopped ████████████ and recovered the Cetrina Drive package, unopened.

---

12  The identity is likely known to agents wh

76.     Agents conducting surveillance observed JAPHET, (Prieto) exiting 6 Windsor at or around this time and took JAPHET into custody.

77.     At approximately, 2:10pm, DEIBBY was arrested at the PIZZA hut on Grafton Street in Worcester.

78.     Agents have secured the location at 6 Windsor Street, Apartment 1, pending the issuance of a warrant to prevent the destruction of any evidence.

79.     Based upon the foregoing, I believe that ████████████████ was delivering the package to DEIBBY and JAPHET at 6 Windsor.

80.     At approximately 2:30pm, CRUZ was taken into custody.

81.     CRUZ was *Mirandized* and agreed to speak.   Among other things, CRUZ identified a photograph of JAPHET as the individual who paid CRUZ $500 in December 2017 for delivering a prior package to JAPHET under circumstances similar to those described in this Affidavit.

## Narcotics Traffickers Use of Residences and Other Properties in Furtherance of Narcotics Trafficking Activities

82.     Based upon my training, experience, and participation in other narcotics investigations:

    a.  I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia in their residences or other properties that they control;

    b.  It is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities such as books, records, receipts, notes, ledgers, money orders and other documents relating to the

transportation, ordering, sale and distribution of controlled substances.   Such documents are generally maintained where the traffickers have ready access to them such as their residence or vehicle and may be present upon computers, tablets or other electronic devices within the defendant's residence.   Also, because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.   Indeed, in this case several intercepted communications suggest that the Target Subjects both obtain and distribute "fronted" narcotics (where the narcotics are supplied to distributors on credit who pay the suppliers after the narcotics are sold).   There were specific intercepted references to DEIBBY stating that he fronted drugs;

c.   Often drug traffickers keep records to show balances due for drugs sold in the past and for payments expected as to the trafficker's supplier and the trafficker's dealer(s);

d.   Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.   Today, most people store records of phone numbers and contacts on cell phones;

e.   Narcotics traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for

their associates in the trafficking organization. Again, today most people store

such records and contact information on cell phones;

f.   Narcotics traffickers commonly have photographs of themselves, their associates,

and their property in their possession and/or on their phones.

g.   Narcotics traffickers usually keep paraphernalia for packaging, weighing and

distributing controlled substances.   These paraphernalia include, but are not

limited to, scales and plastic bags.

h.   Narcotics traffickers also routinely maintain firearms and ammunition in locations

where the firearms are readily accessible should someone attempt to rob them or

should law enforcement personnel attempt to arrest them;

i.   It is also a generally common practice for traffickers to conceal at their residences

or other properties that they control large sums of money, either the proceeds

from drug sales or monies to be used to purchase controlled substances. In this

connection, drug traffickers typically make use of wire transfers, cashier's checks,

and money orders to pay for controlled substances. Evidence of such financial

transactions and records relating to income and expenditures of money and wealth

in connection with drug trafficking would also typically be maintained in

residences; and

j.   Given the prevalence of cell phones, the ease of their use, and the fact that call,

email and texts received and sent by a phone are routinely maintained for weeks if

not months within those phones, it is likely that the call history, text massage

history, and email history, of the phones present at the locations detailed herein

would include evidence of the Target Offenses, such as the identities of co-conspirators, individuals who have aided and abetted the commission of the Target Offenses, and, in the case of text messages, the content of communications between such individuals.   In this specific case there is extensive evidence of the use of cell phones by the Target Subjects.

83.     Without limitation to any authority granted to search any of the Subject Premises for which this Affidavit otherwise establishes probable cause, I believe that:

a.  Illegal narcotics and equipment used to manufacture and distribute substantial quantities of illegal narcotics will be present at the Subject Premises;

b.  Individuals engaged in narcotics trafficking would possess documents or electronic records showing the names and telephone numbers of customers and suppliers as well as accounts showing the monies paid and collected;

c.  Individuals engaged in narcotics trafficking would keep money collected and used in some safe, yet accessible, place, such as their residence or other properties that they control;

d.  Individuals engaged in narcotics trafficking would keep records concerning the transfer of proceeds of the Target Offenses, or valuable items purchased with such proceeds, may also be present in some safe, yet accessible, place, such as their residence or other properties that they control;

e.  Individuals engaged in narcotics trafficking and conspiracy to do so, would utilize cell phones and/or text messages to communicate with co-conspirators and may

maintain those phones on their persons, or in some safe, yet accessible, place, such as their residence.

f.  While this warrant seeks authority to seized cellphones, the electronic content of any cell phone located at the premises to be searched, or upon the persons of any individual present at the locations to be searched, or upon the individuals arrested, will not be searched without a further search warrant or legally valid consent.

## <u>Conclusion</u>

84.  I believe that the evidence, more fully outlined above, establishes probable cause to believe that DEIBBY GARCIA, JAPHET GARCIA, and ERICK CRUZ, have committed the Target Offenses and that evidence of the Target Offenses will be located at 6 Windsor Street, Apartment 1 and in the Cetrina Drive Package;

85.     I believe that the evidence, more fully outlined above, establishes probable cause to believe that DEIBBY GARCIA, JAPHET GARCIA, and ERICK CRUZ have committed the Target Offenses and that probable cause exists to issue Criminal Complaints.

I, Gregg Deboer having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

_____
Gregg Deboer
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me,
this 16th day of January 2018

_____
HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS